UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ROBERT PEACHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:10-cv-448 JD |
| | ) |
| RACHEL ROSS, et al., | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Robert Peacher spent eight months in segregation at the Westville Control Unit in 2010. Meals in that unit are served by guards to prisoners in their cells. Mr. Peacher claimed to have a paralyzing fear of eating unsealed food from guards, though, as he believed that guards had tried to poison his food several years earlier. He thus didn't eat any meals served to him in that manner. Though he was able to survive on commissary food when he could afford it, he lost over 60 pounds during his short stay at Westville. Prison officials viewed Mr. Peacher as being on a hunger strike over his transfer to that facility, and thought he wanted to get transferred or have food delivered by other offenders so that he could resume a trafficking operation he ran at a prior facility. Mr. Peacher disagrees, arguing that his failure to eat was an involuntary product of a mental disorder. He claims that the defendants—a medical doctor and a psychologist—were deliberately indifferent to his needs by failing to provide treatment or make arrangements to allow him to receive an adequate diet.

The defendants moved for summary judgment.[1] They argue that Mr. Peacher did not suffer from a genuine, serious medical need. They also argue they were not deliberately

---

[1] This case experienced unusually prolonged delays before being transferred to the undersigned in April 15, 2019, after a previous motion for summary judgment was denied.

indifferent but provided adequate treatment for what they viewed as a voluntary hunger strike. The Court finds that Mr. Peacher has created genuine disputes of fact on those questions, so the Court denies summary judgment.

## I. FACTUAL BACKGROUND

Plaintiff Robert Peacher is serving an extended term of imprisonment in the Indiana Department of Correction. His claims in this case arise out of his housing at Westville Correctional Facility from April through December 2010. He was housed in administrative segregation for disciplinary reasons as a result of misconduct at a previous facility. Prisoners in administrative segregation receive meals on food trays through a slot in their cell doors, and the food trays are handed out by guards. Mr. Peacher claims that several years earlier, during a previous stay at Westville, he learned that his food had been poisoned by a guard. That prior experience produced a paralyzing fear of being poisoned and prevented Mr. Peacher from eating food served by guards.

From when he first arrived back at Westville in April 2010, Mr. Peacher refused to eat any meals served by guards. Several days later he met with Dr. Thomas Allen, a prison psychologist, for an intake evaluation. Dr. Allen wrote in his notes from that visit that Mr. Peacher denied being on a hunger strike. Mr. Peacher stated that he wanted to eat, but had been unable to eat food given to him by guards since he was poisoned several years earlier. Mr. Peacher said that "he can't make his mind accept food from an officer." [DE 424-2 p. 22]. Mr. Peacher's prior diagnoses, which Dr. Allen did not modify, included antisocial personality disorder and narcissistic personality disorder. Dr. Allen's treatment plan from that intake included monitoring Mr. Peacher's condition "while on this hunger strike." *Id.* p. 25. According to Mr. Peacher, though, all Dr. Allen said was that he should "get over it or die," and Dr. Allen

told him that because he had a degree in psychology, he should know what to do for himself.[2] [DE 425-1 ¶ 14–17]. Dr. Allen later wrote that he believed Mr. Peacher was malingering, or making up symptoms for personal gain, so he could dictate what prison he was housed at or how he received his food.

Mr. Peacher was also examined on multiple occasions by Dr. Rachel Ross, a medical doctor who oversaw his medical care. According to Mr. Peacher, he told Dr. Ross that he was not refusing to eat, but that he was unable to eat food served to him by guards because of his paralyzing fear of being poisoned. Mr. Peacher proposed to Dr. Ross multiple ways of delivering his food that would have allowed him to eat. He asked to receive kosher meals, as those meals are pre-sealed. He also suggested that he be allowed to select his own food tray, which had been allowed at other facilities. He finally informed Dr. Ross that a nurse had volunteered to oversee his food and bring it directly to him. He believed that each of those options would reduce his anxiety about being poisoned enough that he would be able to eat. Dr. Ross refused each one, though. When Mr. Peacher explained that he wanted to eat but was unable to because he was paralyzed with fear, Dr. Ross likewise responded that he had better figure it out or he will die.

Mr. Peacher was regularly seen by nursing staff and his vitals were monitored frequently throughout his time at Westville. He was also occasionally visited by mental health providers. He continued refusing to accept food trays served by guards, though. His diet consisted solely of food he was able to buy from the commissary when he was able to afford it, and other sealed items he received on occasion. When he first arrived at Westville, Mr. Peacher weighed 253 pounds. By mid-May, he weighed 225 pounds, and he continued losing weight throughout his

---

[2] Dr. Allen describes this interaction quite differently, but at summary judgment the Court must construe the facts in the light most favorable to the non-moving party, Mr. Peacher.

stay, albeit with some fluctuations when he had food from the commissary. By the time he was transferred away from Westville at the end of December, Mr. Peacher weighed around 190 pounds, for a loss of over 60 pounds. On a number of occasions, Mr. Peacher's blood sugar was low and nurses gave him food or glucose, but no one ever made arrangements for Mr. Peacher to receive meals in a manner that would allow him to eat them.

Mr. Peacher filed this suit against multiple defendants, claiming they were deliberately indifferent to his inability to eat food served to him by guards, resulting in the denial of food while he was housed at Westville. The Court allowed Mr. Peacher to proceed against various defendants on that claim, but granted a previous motion for summary judgment as to all defendants except Dr. Allen and Dr. Ross. The Court recruited counsel to represent Mr. Peacher on his claims against those defendants. After a supplemental discovery period, those defendants again moved for summary judgment, and that motion has been fully briefed.

## II.  STANDARD OF REVIEW

A court must grant summary judgment if the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008);

*King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on its pleadings but must present evidence sufficient to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

## III. DISCUSSION

Mr. Peacher argues that Dr. Ross and Dr. Allen were each deliberately indifferent to his serious medical needs when they failed to help him obtain adequate food while a mental condition rendered him unable to eat food served by guards. He claims that they violated his Eighth Amendment right to be free of cruel and unusual punishment. An Eighth Amendment claim entails two elements, one objective and one subjective. *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013). First, a plaintiff must have an objectively serious medical need. *Id.* Second, the plaintiff "must show that the defendants were aware of his serious medical need and were deliberately indifferent to it." *Id.* Deliberate indifference is more than negligence and approaches intentional wrongdoing. *Id.*; *see also Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Doctors are "entitled to deference in treatment decisions." *McGee*, 721 F.3d at 481. Even medical malpractice does not establish deliberate indifference, nor does a mere disagreement with a doctor's medical judgment. *Id.*; *see also Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). A plaintiff can satisfy this element, though, by showing that the doctors did not actually base their treatment on their professional medical judgment, but instead knew of and disregarded a substantial risk of harm. *McGee*, 721 F.3d at 481; *Greeno*, 414 F.3d at 653.

The defendants first argue that Mr. Peacher cannot meet the objective element, as they contend that his failure to eat was a voluntary decision borne of a desire to manipulate, not a physical or mental condition that in fact impaired his ability to eat. Mr. Peacher has offered evidence from which a jury could find to the contrary, though. Dr. Jenuwine, a psychologist,

5

opined that Mr. Peacher suffered from a delusional disorder, in that he suffered from nonbizarre delusions (delusions involving situations that can occur in real life) that he had previously been poisoned by guards, which motivated his behavior.[3] If Mr. Peacher had a mental condition that prevented him from receiving an adequate diet, that would satisfy the objective element of his claims. *See Farmer*, 511 U.S. at 832 (stating that "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care"); *Rice ex rel. Rice v. Correctional Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012) ("Contrary to the defendants, we believe that [an inmate's] malnutrition would be actionable regardless of whether it contributed to" a distinct injury.). Mr. Peacher has thus created a genuine dispute of fact on that element.

The defendants each contest the subjective element as well, arguing that they provided acceptable treatment for Mr. Peacher's condition and that, at most, the record reveals a disagreement with their diagnoses or treatment, which is insufficient to establish deliberate indifference. Again, however, the Court concludes that Mr. Peacher has offered evidence that, construed in his favor, could allow a jury to find in his favor on this element. The Court begins with Dr. Allen, a psychologist who oversaw Mr. Peacher's mental health treatment. Dr. Allen states that he concluded, based on his professional judgment, that Mr. Peacher did not have a treatable mental health condition, and was instead malingering and using a hunger strike for personal gain. He argues that Dr. Jenuwine's contrary diagnosis only reflects a disagreement over the proper diagnosis, which is insufficient to establish deliberate indifference.

In response, Mr. Peacher argues in part that the possibility that Dr. Allen believed he was malingering is necessarily a question of fact. That overstates the point somewhat. If a doctor

---

[3] Dr. Jenuwine explained that this opinion assumed that Mr. Peacher had not in fact been poisoned by guards; if he had been, then Mr. Peacher's belief would not have been delusional and his diagnosis may be post-traumatic stress disorder instead.

exercised professional judgment and came to the conclusion that a patient was malingering, the doctor will not have been deliberately indifferent, even if the doctor turns out to have been wrong. *Rice*, 675 F.3d at 684, 687–88. Dr. Jenuwine's disagreement with Dr. Allen's diagnosis is thus insufficient on its own to create a dispute of fact on this element. That can be a difficult point to resolve at summary judgment, though. The upshot of a conclusion that a patient is malingering will often be a decision not to provide treatment, and a refusal to provide treatment for an apparent need can be evidence of deliberate indifference. *See McGowan v. Hulick*, 612 F.3d 636, 641 (7th Cir. 2010); *Greeno*, 414 F.3d at 654–55. Thus, if a plaintiff can provide evidence that doctors did not in fact base their refusal to provide treatment on their professional judgment, summary judgment will be inappropriate. *Greeno*, 414 F.3d at 655 ("The possibility that [the defendants] did not do more for [the inmate] because they thought he was malingering and did not really have a severe medical need is an issue for the jury."); *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) ("The fact that [the defendants] may have based their refusal to treat [the inmate's] pain on a good-faith belief that he was malingering, that he was not in pain but was merely trying to get high with the narcotic painkiller, is an issue for the jury."); *Ambrose v. Puckett*, 198 F. App'x 537, 541 (7th Cir. 2006) ("Whether [the doctor] truly believed [the inmate] was malingering or just did not want to believe that [the inmate's] complaints were serious is a material question of fact.").

The Court concludes that Mr. Peacher has met that burden. To begin with, Mr. Peacher's affidavit attests to statements Dr. Allen made during their first meeting that could be construed as an acknowledgement of his condition and a refusal to treat it. Mr. Peacher states that he told Dr. Allen that he wanted to eat, but was unable to because of his paralyzing fear of eating food from guards. Dr. Allen's response, according to Mr. Peacher, was to "get over it or die." [DE 425-1

7

¶ 14–15]. Telling Mr. Peacher to "get over it" implies that he had something to get over—that he was not making a voluntary decision. Also, when Mr. Peacher explained that he had previously been transferred away from Westville due to his inability to eat the food trays, Dr. Allen responded that he should not have been transferred and that "the staff should have let [him] suffer through it." *Id.* ¶ 13. That statement could likewise be construed as reflecting an acknowledgment of Mr. Peacher's condition and an intent not to treat it and to make him suffer through its effects.

Other medical evidence could support that conclusion too. Dr. Allen opined that Mr. Peacher's mental diagnoses were antisocial personality disorder and narcissistic personality disorder—conditions that were not treatable—and that malingering is strongly correlated with those conditions. He also acknowledged, though, that a person with those conditions could still have other, legitimate conditions, and that Mr. Peacher's statements could be consistent with other conditions. But Dr. Allen denied having relied on the previous diagnoses in Mr. Peacher's file and was unable to recall anything he did to confirm those diagnoses. Dr. Jenuwine also opined that the contemporaneous medical records did not reflect that other conditions were assessed or ruled out for Mr. Peacher. He further opined that labeling Mr. Peacher a malingerer appeared to have been just a convenient way to avoid having to deal with his condition. A doctor's decision to pursue an "easier and less efficacious treatment" can be evidence of deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). The decision to label Mr. Peacher a malingerer and thus avoid providing treatment, combined with evidence suggesting that Dr. Allen did not exercise his professional judgment in reaching that decision, could thus support a finding that he was deliberately indifferent.

Dr. Allen also argues that he provided adequate treatment because Mr. Peacher was seen occasionally by mental health providers and was instructed on self-treatment techniques. As Mr. Peacher describes it, though, Dr. Allen told him that because Mr. Peacher had a degree in psychology, he should know what to do. In addition, even if the limited therapy or instruction Mr. Peacher received was appropriate, the problem remains that Mr. Peacher was unable to eat. When Dr. Allen first saw Mr. Peacher, Mr. Peacher had already missed almost a week's worth of meals. By the next visit the following month, Mr. Peacher had lost almost 30 pounds, and Mr. Peacher's failure to eat persisted throughout his time at Westville. A jury could thus find that Dr. Allen was deliberately indifferent in failing to make other arrangements for Mr. Peacher's food so that he could receive an adequate diet, even while undergoing treatment for his underlying disorder. In sum, Dr. Allen was aware of facts that Mr. Peacher faced a substantial risk of serious harm—Mr. Peacher told him he could not eat the only meals that were served to him, and he failed to eat those meals throughout his stay at Westville—and a jury could find that Dr. Allen disregarded that risk in declining to address that problem, resulting in Mr. Peacher receiving inadequate nutrition. Thus, the Court must deny the motion for summary judgment as to Dr. Allen.

Mr. Peacher also asserts a claim against Dr. Ross, a medical doctor. Dr. Ross argues that her role was only to monitor Mr. Peacher's physical condition during his hunger strike. She argues that she, and nurses working under her supervision, monitored Mr. Peacher's condition regularly and provided any necessary care, and that Mr. Peacher's weight remained in normal limits despite his pronounced weight loss. Mr. Peacher does not argue that Dr. Ross failed to

properly address the *effects* of his failure to eat, though.[4] Instead, he argues that she should have taken steps so that he didn't have to go without eating in the first place. Prisoners have a right to receive adequate food, not just to be treated for the effects of malnutrition. *See Atkins v. City of Chi.*, 631 F.3d 823, 830 (7th Cir. 2011) ("Depriving a person of food for four days would impose a constitutionally significant hardship[.]"). Mr. Peacher states in his affidavit that he proposed multiple alternatives to Dr. Ross that would have allowed him to eat, but that she refused each one, knowing that would result in his inability to eat.

Mr. Peacher first asked if he could receive kosher meals. Those meals are pre-sealed, which would have allayed his fears of being poisoned by guards. Dr. Ross refused that request, even though Mr. Peacher says he received those meals at another facility. Mr. Peacher also asked to be able to select his own food tray, another accommodation that had been made at another facility and that allowed him to eat. Dr. Ross said no to that too. Mr. Peacher also said that a nurse volunteered to bring his food directly to him, but Dr. Ross refused that as well. Instead, she told him that he "had better figure it out or [he] will die." [DE 425-1 ¶ 23].

Dr. Ross says little about why she refused these proposals.[5] Dr. Ross testified that the reason Mr. Peacher refused to eat was outside of her ambit as a medical doctor, and would have been the mental health professionals' responsibility. Dr. Allen testified, however, that an order for kosher meals would have had to come from a medical order. Dr. Ross also argues that she could not order kosher meals because Mr. Peacher did not need kosher meals for religious reasons. A jury could reasonably disbelieve that argument, though. First, Mr. Peacher stated that

---

[4] For what it's worth, there is no evidence that Dr. Ross' treatment of those effects was deficient, but that is not the basis for Mr. Peacher's claim.
[5] None of these proposals appear related to the reason the defendants suggest Mr. Peacher was malingering, either—to get transferred or have his food delivered by other inmates.

10

he had received kosher meals at a previous facility to allow him to eat, showing that was a possibility. Second, if Mr. Peacher needed to have kosher meals in order to receive an adequate diet, that could be a valid medical reason to order kosher meals for him, regardless of whether he had a religious need for those meals. Dr. Ross testified that she couldn't order kosher meals for people who have no need for them. But construing the facts in Mr. Peacher's favor, he did have a need for kosher meals since he could not receive an adequate diet if he only received unsealed food. And, according to Mr. Peacher, Dr. Ross knew that because he told her so.

Dr. Ross testified that Mr. Peacher told her he was choosing not to eat, and that she therefore didn't consider whether his failure to eat was intentional or not. But Mr. Peacher testified to the contrary, that he told Dr. Ross that he wanted to eat but was unable to because of his paralyzing fear of poisoning. Prisoners have a right to receive an adequate diet, and if Dr. Ross knew that Mr. Peacher could not eat the food that was provided to him, yet refused to take steps within her control to allow him to eat, a jury could find that she was deliberately indifferent to his serious needs. *See Reed v. McBride*, 178 F.3d 849 (7th Cir. 1999) (holding that summary judgment was improper where prison officials knew the inmate was not receiving food yet failed to take steps within their power to remedy that problem). The Court therefore denies summary judgment as to Dr. Ross too.

## IV. CONCLUSION

The Court DENIES the defendants' motion for summary judgment. [DE 422].

SO ORDERED.

ENTERED: March 23, 2020

                                          /s/ JON E. DEGUILIO
                                        Judge
                                        United States District Court